## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE | § | |
| COMMISSION, | § | |
| **Plaintiff,** | § | |
| v. | § | Civil Action No. 3:20-CV-2988-S-BH |
| | § | |
| CLIFTON CURTIS SNEED, JR., | § | |
| **Defendant.** | § | Referred to U.S. Magistrate Judge |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

By electronic order of reference dated February 10, 2021 (doc. 12), before the Court is *Plaintiff's Motion for Final Judgment by Default against Clifton Curtis Sneed, Jr. and Brief in Support*, filed February 9, 2021 (doc. 10). Based on the relevant filings and applicable law, the motion should be **GRANTED.**

## I. BACKGROUND

On September 28, 2020, the Securities and Exchange Commission (SEC) filed this suit against Clifton Curtis Sneed, Jr. (Defendant), alleging that he violated of Sections 206(1) and (2) of the Investment Advisers Act of 1940 (Advisers Act), 15 U.S.C. § 80b-6(1), (2); Section 10(b) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b–5; and Section 17(a) of the Securities Act of 1938 (Securities Act), 15 U.S.C. § 77q. (*See* doc. 1 at 1, 15-17.)[1] It alleges that from approximately November 2014 through December 2019 (Relevant Period), Defendant defrauded numerous clients by holding himself out as a financial and investment expert who could help unsophisticated investors quickly earn huge profits from guaranteed investments, lying about his credentials and concealing that he had been

---

[1] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

the subject of multiple regulatory and criminal actions for securities violations, misrepresenting the size and scope of his sole proprietorship, and failing to disclose that he was being paid commissions on the investments he recommended.  (*See id.* at 1-3.)  Defendant's clients lost at least $1.1 million because of his conduct, while he received approximately $400,000 in advisory fees and undisclosed commissions. (*Id.* at 3, 15.)  The SEC seeks permanent injunctive relief, disgorgement of ill-gotten gains plus prejudgment interest, penalties, and any other necessary equitable and ancillary relief.  (*Id.* at 2.)

According to the complaint, prior to and during the Relevant Period, Defendant was charged, sentenced and/or disciplined for violating federal and state, criminal and civil securities laws. (*Id.* at 3-5.) On or about February 16, 2007, he pleaded guilty to felony securities fraud and other securities charges in Utah, and he was sentenced to a five-year suspended prison sentence and ordered to pay restitution.  (*Id.* at 3.)  In a consent order dated on or about March 30, 2007, Defendant admitted the existence of evidence showing that he willfully made material misrepresentations and omissions in connection with the offer of a security, and he was ordered to cease and desist from further violation of the Utah Uniform Securities Act and to pay a fine.  (*Id.* at 4.)  On or about August 18, 2006, a consent order was entered against him in *SEC v. Unlimited Cash, Inc., et al*, No. 3:06-CV-594-K (N.D. Tex.), doc. 32, which enjoined him from further violations of the antifraud and registration provisions of the federal securities laws that he was accused of violating.  (*Id.*)  The consent order was amended on or about January 11, 2008.  (*Id.*) Less than three weeks later, "[o]n or about January 28, 2008, the SEC issued an Order Instituting Administrative Proceedings pursuant to Section 15(b) of the Exchange Act, Making Findings, and Imposing Remedial Sanctions against" Defendant; under Section 15(b)(6) of the Exchange Act, he was barred from association with any broker, dealer, or investment adviser. (*Id.*) The Texas

State Securities Board issued an emergency order on or about December 11, 2014, that Defendant cease and desist from engaging in any fraud in connection with the offer or sale of any security in Texas or in other violations of the Texas Securities Act. (*Id.*) The Alabama Securities Commission also issued an order on or about December 15, 2016, that Defendant cease and desist from further offers or sales of a security into, within, or from the State of Alabama. (*Id.* at 5.) "On or about March 13, 2018, the Georgia Commissioner of Securities issued a Cease and Desist and Imposition of Civil Penalties order against" Defendant to cease and desist from all violations of the Georgia Uniform Securities Act. (*Id.*) Defendant was subsequently indicted in this district on charges of wire and securities fraud in November 2019, and he is detained while awaiting trial on those charges. (*Id.* at 3, 5); *see also United States v. Sneed et al*., 3:19-CR-580-B (N.D. Tex.). That criminal case is related to this case. (*Id.* at 5.)

No later than 2014, Defendant began marketing The Trade Group (TTG), of which he was the sole proprietor, and which he operated from his home in Cedar Hill, Texas, as a vehicle for obtaining his financial and investment advisory services. (*Id.* at 1, 5-6, 11.) His multifaceted marketing efforts in multiple states placed a particular emphasis on pastors and churchgoers. (*Id.* at 5-6.) To receive Defendant's advisory services, clients had to become members of TTG by executing a membership agreement and paying an upfront, non-refundable, lifetime membership fee that typically ranged between $5,000 and $20,000. (*Id.* at 6.) This membership fee compensated Defendant for advising clients about investing in, purchasing, or selling securities, as well as other investment opportunities, and his investment services included access to purportedly exclusive and pre-vetted securities. (*Id.*) Defendant repeatedly counseled against investing in the stock market and more traditional securities investments, such as mutual funds, exchange-traded securities, and bonds, contending that these investments would not provide enough money for retirement. (*Id.* at

3

7.) The compensation he received from TTG's approximately 100 clients was Defendant's primary source of income. (*Id.* at 6, 11.)

In approximately September 2017, Defendant began recommending to TTG's clients that they enter into investment contracts relating to two different digital asset mining pools (DAMPs). (*Id.* at 7.)  DAMPs, which are securities, are "collection[s] of linked computers or specialized processors that work to solve a computational problem necessary to win the right to confirm a block of digital asset transactions;" the first machine to solve the problem receives an award of newly created digital assets often valued at tens of thousands of dollars, which is shared by the mining pool. (*Id.* at 7-10.) Defendant actively promoted and recommended the DAMPs to his current and prospective TTG clients through e-mails, the internet, in-person consultations, and marketing materials from the DAMPs that he revised to include TTG's information, without disclosing his receipt or expectation of commissions.  (*Id.* at 8-9.)

Between approximately September 2017 and March 2018, Defendant promoted the first DAMP, which purported to operate in several countries, as a safe and profitable investment, and he falsely claimed that clients' investments would be insured against any loss of principal.  (*Id.* at 8-9.)  He told one client that her investment would be guaranteed and insured, it would yield returns of 25%-60% per month, and she would receive a guaranteed return of $15,000 within 90 days. (*Id.* at 8, 12.) She sent in the entire TTG advisory fee and the funds for the DAMP in January 2018, and when she inquired about the $15,000 payment in May 2018, Defendant's wife told her that the person in charge of the DAMP had been kidnapped and killed, and that the DAMP had stopped responding and closed its website.  (*Id.* at 8.)  Because there was no insurance or other protection against losses, the client and other TTG clients who invested in the first DAMP lost their investments.  (*Id.* at 8-9.) Between approximately August 2018 and January 2019, Defendant

4

began recommending and promoting a second overseas DAMP that purported to guarantee annual investment returns of up to 400%.  (*Id.* at 9, 14.)  TTG clients lost all their investments when the second DAMP's overseas promoters stopped communicating with investors and took down the website without returning funds or paying promised returns.  (*Id.* at 9, 13-14.)  TTG clients used wire transfers, checks, or bitcoin to fund their investments in the DAMPs. (*Id.* at 9-10.)  They were promised significant returns to be generated by the pooled output from the digital asset mining equipment, with no role beyond funding their investments, and they depended on the claimed expertise and managerial efforts of the DAMPs' promoters. (*Id.* at 9-10.)

While marketing and providing his investment advisory services and offering the DAMPs securities to current and prospective clients, Defendant misrepresented and omitted material facts and engaged in deceptive actions. (*Id.* at 10.)  He misrepresented his background by failing to disclose his criminal conviction, the cease-and-desist orders in different states, the permanent injunction and bar, or any other aspect of his disciplinary history, and he took steps to actively hide his disciplinary history by instructing his salespeople either to not use his name or to refer to him by a fake name and by adopting various pseudonyms. (*Id.* at 10-11.)  He also falsely claimed to hold a variety of certifications, representing that he was a certified financial planner, a certified senior advisor, and/or a certified asset protection specialist. (*Id.* at 11.)

Defendant mispresented the size and scope of TTG, claiming that it was one of the largest firms in the world, had 30,000 private members and 550,000 account holders, and received thousands of requests for investments on a weekly basis. (*Id.*)  He repeatedly adopted claims from third parties as if they were controlled by or associated with TTG. (*Id.*)  For example, he made claims, which he took from the first DAMP's marketing materials, "that TTG was 'the world's number 1 trading provider' with over 150 million orders filled to date with clients from over 173

countries with billions deposited to date, and that TTG did all the trading for [its] clients," knowing the claims were false.  (*Id.* at 11.)  He also revised the marketing materials for the DAMPs to falsely make it appear that TTG had a direct role in those ventures.  (*Id.* at 12.)  In addition, Defendant falsely represented that the investment opportunities he was promoting were exclusive to TTG clients, and some clients paid the membership fee so they could invest in the DAMPs. (*Id.* at 11-12, 14.)

Defendant also misled investors about investment returns and safety, representing that the first DAMP would pay monthly returns of 25% to 60%, the second DAMP would pay 400% annual returns, and the returns were guaranteed and either insured or safer than the stock market.  (*Id.* at 12.)  He also represented that investors in the second DAMP could turn $100,000 into $1.6 million in two years, despite his concerns that the second DAMP was misleading him and investors based on his recent experience with the first DAMP.  (*Id.* at 12-13.)  Defendant falsely led current and prospective TTG clients to believe that he had thoroughly vetted the DAMP investments, but he conducted no meaningful due diligence on them, did not verify the accuracy of his representations about them, and had no reasonable basis for making the representations.  (*Id.*)  He also provided deceptive materials to his salespeople to use in marketing, including scripts for cold-calling and a screen shot showing an investment account with a 45% weekly profit, which he told them to represent as their own trading and investment profits.  (*Id.* at 13.)

Defendant also failed to disclose conflicts of interest. (*Id.* at 14.) Several of the companies he recommended to TTG clients as investments promised to pay him referral commissions, but he never disclosed the arrangement to clients.  (*Id.* at 14-15.) He was promised 30% and 10% referral commissions for each of his clients' investments in the first and second DAMPs, respectively, and he was paid or credited commissions before both DAMPs shut down, although the second DAMP

shut down before he could withdraw the funds. (*Id.*) TTG clients lost all or substantially all of their investment funds, which had a value of at least $1.1 million in total. (*Id.* at 15.)

According to the declaration supporting the SEC's motion for default judgment, its investigation revealed that Defendant was the authorized signer and exercised control over seven bank accounts. (doc. 11-1 at 2-3.) Analysis of the records for those bank accounts during the Relevant Period showed that Defendant raised a total of approximately $1.8 million in connection with his advisory business from known and unknown sources as well as cash deposits. (*Id.* at 3-4, 7.) Based on the records, correspondence with clients, and other related materials, Defendant received funds from at least 75 clients during the Relevant Period. (*Id.* at 4-5.) Because he testified that his advisory business was his sole source of income, the entire $1.8 million likely consists of advisory fees, other investment funds from clients, and commissions. (*Id.* at 4-7.) After additional analysis to justify its conclusion regarding the total funds raised during the Relevant Period, the SEC was able to generally tie approximately $1,383,000 million to more reliable and definitive sources than the bank records, and it used that figure as the starting point for calculating disgorgement. (*Id.*) No deduction from that amount was made for legitimate business expenses because the funds appeared to have been used for personal expenses and non-business items, and there were no records or information to substantiate any legitimate business expenses. (*Id.* at 7.) Deductions were made, however, for approximately $455,000 Defendant sent to international investment entities and salespeople during the Relevant Period, and for approximately $498,927.93 that Defendant transferred to unknown accounts and that was possibly also sent to international investment entities and salespeople during the Relevant Period. (*Id.* at 8.) As a result of its analysis, the SEC concluded that the disgorgement amount is $429,072.07, which represents Defendant's net profits from his alleged wrongful conduct. (*Id.*) This amount is equal to the

conservative approximately $1.38 million Defendant received in advisory fees, other investment funds from clients, and commissions, minus the approximately $455,000 he sent to international investment entities and salespeople during the Relevant Period, and the approximately $498,927.93 he also possibly sent to them. (*Id.*)

The SEC also calculated prejudgment interest on the disgorgement amount of $429,072.07 using the Internal Revenue Service's (IRS) rate of interest on tax underpayments and refunds, which is adjusted each quarter to approximate the economic time value of money during that quarter for the period beginning October 28, 2019 (the last date client funds were deposited in the seven bank accounts Defendant controlled), through January 31, 2021.  (*Id.* at 8-9; doc. 11-2.)  It seeks $21,132.63 in prejudgment interest, for a final total disgorgement amount of $450,204.70. (doc. 11-1 at 9.)

A summons was issued for Defendant on September 28, 2020, the day the SEC filed this action, and it filed a return showing that it properly served him on October 19, 2020. (*See* docs. 6-7.) After he failed to answer or respond to the complaint, the SEC sought entry of default on January 19, 2021, and it was entered that same day. (*See* docs. 8-9.)  It now moves for final default judgment.  (*See* doc. 10.)

## II.  MOTION FOR DEFAULT JUDGMENT

Rule 55 sets forth the conditions under which default may be entered against a party, as well as the procedure to seek the entry of default judgment. There is a three-step process for securing a default judgment. *See New York Life Ins. Co. v. Brown*, 84 F.3d 137, 141 (5th Cir. 1996). First, a default occurs when a party "has failed to plead or otherwise defend" against an action. Fed. R. Civ. P. 55(a). Next, an entry of default must be entered by the clerk when the default is established "by affidavit or otherwise." *See id.; New York Life Ins. Co.*, 84 F.3d at 141. Third, a

party may apply to the clerk or the court for a default judgment after an entry of default. Fed. R. Civ. P. 55(b); *New York Life Ins. Co.*, 84 F.3d at 141.

Here, Defendant failed to plead or otherwise defend in this suit, and the SEC obtained an entry of default on February 9, 2021 (*See* docs. 8-9.)  The first two requisites for a default judgment have been met and remaining for determination is whether a default judgment is warranted.

## A. Procedural Appropriateness

"'Default judgments are a drastic remedy, not favored by the Federal Rules and resorted to by courts only in extreme situations.'" *Lewis v. Lynn*, 236 F.3d 766, 767 (5th Cir. 2001) (quoting *Sun Bank of Ocala v. Pelican Homestead & Sav. Ass'n*, 874 F.2d 274, 276 (5th Cir. 1989)). Moreover, "a party is not entitled to a default judgment as a matter of right, even where the defendant is technically in default." *Id.* (quoting *Ganther v. Ingle*, 75 F.3d 207, 212 (5th Cir. 1996) (per curiam)). "There must be a sufficient basis in the pleadings for the judgment entered." *Nishimatsu Constr. Co. v. Hous. Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975). Only well-pleaded facts, not conclusions of law, are presumed to be true. *Id.* Default judgment "should not be granted on the claim, without more, that the defendant had failed to meet a procedural time requirement." *Mason & Hanger–Silas Mason Co., Inc. v. Metal Trades Council*, 726 F.2d 166, 168 (5th Cir. 1984) (per curiam). Entry of judgment by default is discretionary. *Smith v. Sanders*, No. 3:12-CV-4377-M, 2020 WL 3260489, at *2 (N.D. Tex. May 19, 2020), *report and recommendation adopted*, 2020 WL 3259391 (N.D. Tex. June 15, 2020) (citing *Stelax Indus., Ltd. v. Donahue*, No. 3:03-CV-923-M, 2004 WL 733844, at *11 (N.D. Tex. Mar. 25, 2004)). "Any doubt as to whether to enter or set aside a default judgment must be resolved in favor of the defaulting party." *John Perez Graphics & Design, LLC v. Green Tree Inv. Grp., Inc.*, No. 3:12-CV-4194-M, 2013 WL 1828671, at *3 (N.D. Tex. May 1, 2013) (citing *Lindsey v. Prive Corp.*,

161 F.3d 886, 893 (5th Cir.1998)).

Courts consider several factors in deciding whether to issue a default judgment. *Smith*, 2020 WL 3260489, at \*3 (citing 10A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane & Richard L. Marcus, FEDERAL PRACTICE AND PROCEDURE § 2685 (3d ed. 1998)). The applicable factors include: (1) the amount of money involved; (2) whether there are material issues of fact or issues of substantial public importance at stake; (3) whether the default is technical in nature; (4) the extent of prejudice to the plaintiff due to the delay; (5) whether the grounds for default are clearly established; (6) the harsh effect of a default judgment; (7) whether the default resulted from a good faith mistake or excusable neglect on the defendant's part; (8) whether the plaintiff's actions contributed to the delay; and (9) whether the court would be obligated to set aside the default on motion by the defendant. *Id.* (citing 10A Wright, Miller, Kane & Marcus, FEDERAL PRACTICE AND PROCEDURE § 2685); *see also Stelax Indus., Ltd.*, 2004 WL 733844, at \*11 (same).

The SEC seeks injunctive relief and a total aggregate amount of $710,204.70, which consists of: (i) a disgorgement of $429,072.07 of the net profits gained by Defendant, (ii) pre-judgment interest of $21,132.63, and (iii) a civil penalty of $260,000 for violations of the Advisers Act, the Securities Act, and the Exchange Act. (doc. 10 at 7.) It provides a declaration and a table calculating the pre-judgment interest amount to verify the relief amounts it seeks in the motion for default judgment. (*See* docs. 11-1, 11-2.)

Under the first factor, although the amount of money involved is substantial, "it is not dispositive." *US Green Bldg. Council, Inc. v. Wardell*, No. 3:14-CV-01541-M-BH, 2016 WL 3752964, at \*3 (N.D. Tex. June 17, 2016), *report and recommendation adopted*, 2016 WL 3766362 (N.D. Tex. July 11, 2016). Under the second factor, there are no material issues of fact

10

in dispute, as Defendant failed to file any responsive pleadings in this case. *See Nishimatsu Constr. Co.*, 515 F.2d at 1206 (noting that "[t]he defendant, by his default, admits the plaintiff's well pleaded allegations of fact"). There is also substantial public importance in protecting future investors from Defendant's allegedly fraudulent investment activities. *See SEC v. First Fin. Grp. Of Tex.*, 645 F.2d 429 (5th Cir. 1981) ("[T]he public interest is in effective protection against future harm to the public from a defendant's fraudulent investment schemes. . . ."). Although the default appears to be technical in nature (third factor), the SEC is prejudiced and harmed by the continued delay in the case, which is the fourth factor. *See United States v. Fincanon*, No. 7:08-CV-61-O, 2009 WL 301988, at *2 (N.D. Tex. Feb. 6, 2009) (holding that a plaintiff's interests were prejudiced because the defendant's failure to respond brought the adversary process to a halt). Under the fifth and six factors, the grounds for default are clearly established, and a default judgment is not unusually harsh under these facts, as Defendant had ample notice of the complaint to answer or otherwise defend. *See Lindsey*, 161 F.3d at 893. The seventh, eighth, and ninth factors similarly favor default judgment because Defendant has not offered any evidence that the failure to answer was the product of a good faith mistake or excuse, the SEC has not contributed to the delay in this case, and there does not appear to be any basis upon which the Court would be obligated to set aside the default. *See Lindsey*, 161 F.3d at 893; *see also SEC v. Thomas*, No. 3:13-CV–739–L, 2015 WL 568983, at *4-5 (N.D. Tex. Feb. 11, 2015) (finding that a district court may refuse to set aside a default judgment if it finds the default was either willful or that the defendant failed to present a meritorious case) (citing *Latham v. Wells Fargo Bank*, 987 F.2d 1199, 1201–1202 (5th Cir.1993)("Parties have a duty to inquire periodically into the status of their litigation.").

Because Defendant was properly served in this action and failed to respond or otherwise defend himself, the grounds for default judgment are clearly established. (*See* docs. 8-9.)

11

Accordingly, default judgment is procedurally warranted.

## B. <u>Sufficient Factual Basis</u>

"If procedurally appropriate, the Court must next consider whether the plaintiff's complaint is adequate." *Branch Banking and Trust Co. v. Randhawa Ventures, Inc.*, No. 3:19-CV-1426-M, 2019 WL 7879732, at *1 (N.D. Tex. Sep. 20, 2019). "[A] defendant's default does not in itself warrant the court in entering a default judgment." *Id.* (quoting *Nishimatsu Constr. Co.*, 515 F.2d at 1206). "There must be a sufficient basis in the pleadings for the judgment entered." *Id.* (quoting *Nishimatsu Constr. Co.*, 515 F.2d at 1206). In determining whether there is a sufficient basis in the pleadings for judgment, the Fifth Circuit "draw[s] meaning from the case law on Rule 8." *Wooten v. McDonald Transit Assocs., Inc.*, 788 F.3d 490, 497 (5th Cir. 2015). Factual allegations in the complaint need only "be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The pleading must present "more than an unadorned, the-defendant-unlawfully-harmed-me accusation," but "detailed factual allegations" are not required. *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). [2]

### 1. *Violations of the Advisers Act*

The SEC asserts that Defendant committed violations of Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. § 80b-6(1), (2). (*See* docs. 1 at 15-16; 10 at 16-19.)

"The Advisers Act's purpose is 'to impose fiduciary standards on investment advisers.'" *Sec. & Exch. Comm'n v. Woodley*, No. 4:15-CV-2767, 2018 WL 3303167, at *1 (S.D. Tex. July

---

[2] The sufficient basis for pleadings under Rule 8 is less rigorous than that under Rule 12(b)(6). *Wooten v. McDonald Transit Assocs., Inc.*, 788 F.3d 490, 498 (5th Cir. 2015). Recognizing that "a defendant must invoke Rule 12 in order to avail itself of that Rule's protections, [while] a default is the product of a defendant's inaction," the Fifth Circuit has "decline[d] to import Rule 12 standards into the default-judgment context." *Id.* at 498 n.3.

5, 2018) (quoting *Steadman v. S.E.C.*, 603 F.2d 1126, 1134 (5th Cir. 1979)). This fiduciary duty is "[an] affirmative duty of 'utmost good faith, and full and fair disclosure of all material facts,' as well as an affirmative obligation 'to employ reasonable care to avoid misleading' the" investment adviser's clients. *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963).

> Sections 206(1) and (2) of the Advisers Act provide:
>
> It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—
>
> (1) to employ any device, scheme, or artifice to defraud any client or prospective client; or
>
> (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client.

15 U.S.C. § 80b-6(1), (2). An investment adviser is "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities." *See* § 80b–2(11). The term "securities" is broadly defined to include, among other things, investment contracts. *See* 15 U.S.C. § 80b–2(a)(18); *see also* 15 U.S.C. § 77b(a)(1); *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 382 (2014) (explaining that the Securities Act, the Exchange Act, and the Advisers Act have "virtually identical definitions" of "security").  An investment contract qualifies as a security if it meets three requirements: "(1) an investment of money; (2) in a common enterprise; and (3) on an expectation of profits to be derived solely from the efforts of individuals other than the investor." *Williamson v. Tucker*, 645 F.2d 404, 417-18 (5th Cir. 1981) (citing *SEC v. Koscot Int'l, Inc.*, 497 F.2d 473 (5th Cir. 1974)); *see also SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946) (developing a "flexible" test as used in

*Williamson* to determine whether an investment contract qualifies as a security).[3]

"Scienter is required to show a violation of § 206(1)," while "[n]egligence is sufficient to show a violation of § 206(2)." *S.E.C. v. Seghers*, 298 F. App'x 319, 328 (5th Cir. 2008) (citing *Steadman*, 603 F.2d at 1134); *see also Capital Gains Research Bureau, Inc.*, 375 U.S. at 195 (finding that *scienter* is not required to prove Section 206(2)). *Scienter* is an "intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *R2 Inv. LDC v. Phillips*, 401 F.2d 638, 643 (5th Cir. 2005) (quoting *Southland Sec. Corp., v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 366 (5th Cir. 2004). Severe recklessness is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Nathenson v. Znagen Inc.*, 267 F.3d 400, 408 (5th Cir. 2001) (quoting *Broad v. Rockwell Int'l Corp.,* 642 F.2d 929, 961-62 (5th Cir.1981) (en banc)); *see also SEC v. Stanford Int'l Bank*, No. 3:09-CV-0298-N, 2011 WL 13160374, at *5 (N.D. Tex. Nov. 13, 2019) (extending "severe recklessness" to the definition of *scienter* for a cause of action brought under Section 206(1) of the Advisers Act).

Here, the complaint alleges that Defendant violated Sections 206(1) and 206(2) of the Advisers Act. (doc. 1 at 15-16.) It alleges that he acted as an investment adviser by engaging in the business of providing financial and investment advisory services to clients in purchasing or

---

[3] Given the similarities between the Advisers Act, the Securities Act, and the Exchange Act, courts look to caselaw interpreting all the statutes when evaluating violations under each statute. *See SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195 (1963) ("Congress intended the Investment Advisers Act of 1940 to be construed like other securities legislation ...."); *S.E.C. v. Seghers*, 298 F. App'x 319, 327–28 (5th Cir. 2008) ("The language of the anti-fraud provisions of § 206 of the Investment Advisers act is drawn from § 17(a)(1) and (3) the Exchange Act, and conduct falling within § 17(a)(1) and (3) will fall within the analogous provisions of § 206 when committed by an investment adviser against a client or prospective client.").

selling securities or other investment options and receiving compensation for his services. (*Id.* at 6-7.) It also alleges that he advised his clients on investing in specific securities, such as the DAMPs, and against investing in the stock market or other traditional securities. (*See id.* at 7, 9.)

The SEC alleges that the DAMPs meet all three requirements of an investment contract and are "securities" under the Advisers Act, the Securities Act, and the Exchange Act. (doc. 10 at 15.) To meet the "investment of money" requirement, the SEC presents evidence showing deposits in Defendant's bank accounts of approximately $429,072.07 in net profits from advisory fees, investment funds from clients, and commission payments. (doc. 11-1 at 8.) The complaint alleges that investors in one or both DAMPs paid money for their interests by using wire transfers, checks, or bitcoin. (doc. 1 at 9.)  To show the existence of a "common enterprise," the complaint alleges that "[t]he TTG clients depended upon the claimed expertise of the promoters of the digital asset mining pools, and their fortunes were solely linked to the efforts of the promoters in obtaining and profitably operating the digital asset mining equipment." (docs. 1 at 10.) It also alleges that the promoters of both DAMPs provided Defendant marketing materials to distribute to potential clients, and that he actively promoted and recommended the DAMPs by using those marketing materials, which he revised to include TTG's name and his e-mail address, as well as e-mails, information posted on the internet, and in-person consultations. (doc. 1 at 7-9.) To meet the final "expectation of profits" requirement, the complaint alleges that "[t]he TTG clients' role was entirely passive, and they had a reasonable expectation of profits to be derived, if at all, entirely from the managerial efforts of the promoters operating the digital asset mining pools." (docs. 1 at 10; 10 at 16.) It also alleges that the investors were guaranteed 25%-60% monthly returns under the first DAMP, and 400% annual returns under the second DAMP. (*Id.* at 12.)

The complaint alleges that Defendant misrepresented his background by not disclosing his

previous violations of securities laws to his clients and falsely claiming his credentials and certifications as an investment adviser to potential clients, and that he took steps to actively conceal his identity from clients to shield his past conduct. (*Id.* at 10-11.) It also alleges that he misrepresented the size and scope of TTG as one of the largest investment firms in the world and the exclusivity of the investment opportunities offered by TTG. (*Id.* at 10-11.) It alleges that Defendant misrepresented to his clients that both DAMPs were safe investments and provided guaranteed and insured returns, without conducting any due diligence to verify his statements. (*Id.* at 12.) It also alleges that he knowingly, or recklessly, made false statements about the safety and guaranteed returns of both DAMPs, and provided his salespeople deceptive materials for marketing efforts. (*Id.* at 12-13.)  The complaint alleges that after Defendant's clients lost all the money they invested in the first DAMP, he promoted the second DAMP as a safe investment to current and prospective clients, even though he was "privately skeptical" of the investment and believed his clients were likely being misled and would lose their investments, which ultimately happened. (*Id.* at 13-14.) It also alleges that he failed to disclose that he was receiving commissions from companies for referral arrangements, including the 30% and 10% referral commissions for each of his clients' investments in both DAMPS, which was a clear conflict of interest. (*Id.* at 14-15.)

The SEC's allegations establish that Defendant was an investment adviser and owed a fiduciary duty to his clients. *See Steadman*, 603 F.2d at 1134.  They also establish that the DAMPs are investment contracts and qualify as securities under the Advisers Act, the Securities Act, and the Exchange Act. *See Williamson*, 645 F.2d at 417-18. The SEC has shown that while Defendant was acting as an investment adviser, he employed fraudulent devices and had engaged in fraudulent or deceitful transactions, practices, and courses of business to defraud current or

prospective clients. The SEC's showing is also sufficient to conclude that Defendant engaged in his misconduct with *scienter*. Because the SEC has established that Defendant violated Sections 206(1) and 206(2) by acting with a high degree of *scienter*, or recklessness, it is entitled to default judgment under the Advisers Act. *See Steadman,* 603 F.2d at 1134.

### 3. Violations of the Securities Act and the Exchange Act

The SEC asserts violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5. (*See* docs. 1 at 16-18; 10 at 19-20.)

Section 10(b) of the Exchange Act and Rule 10b–5 make it unlawful for any person, in connection with the purchase or sale of a security, directly or indirectly, to (a) "employ any device, scheme, or artifice to defraud"; (b) "make an untrue statement of a material fact" or a material omission; or (c) "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." *SEC v. Shavers*, No. 4:13–CV–416, 2014 WL 4652121, at *8 (E.D. Tex. Sep. 18, 2014) (quoting 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b–5). To establish violations of Section 10(b) and Rule 10b–5 for material representations or misleading omissions, the SEC must prove three elements: "(1) material misrepresentations or materially misleading omissions,[4] (2) in connection with the purchase or sale of securities, (3) made with scienter." *SEC v. Sethi*, 910 F.3d 198, 206 n.4 (5th Cir. 2018) (quoting *SEC v. Seghers,* 298 F. App'x 319, 327 (5th Cir. 2008)) (citation omitted); *see also SEC v. Gann,* 565 F.3d 932, 936 (5th Cir. 2009).

To prove a violation in the offer or sale of securities under Section 17(a) of the Securities

---

[4] "[T]he standard for misrepresentation is whether the information disclosed, understood as a whole, would mislead a reasonable potential investor. [And a] statement or omitted fact is material if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *SEC v. Provident Royalties, LLC*, No. 3:09–CV–01238–L–BH, 2013 WL 5314354, at *4 (N.D. Tex. Sep. 23, 2013) (quoting *Seghers*, 298 F.App'x at 328) (citations omitted)).

Act,[5] the SEC must also establish those same elements for material misrepresentations and omissions under Section 10(b) and Rule 10b-5. *SEC v. Mapp*, No. 4:16-CV-246, 2017 WL 5177960, at *9 (E.D. Tex. Nov. 8, 2017) (citations omitted); *SEC v. Provident Royalties, LLC*, No. 3:09–CV–01238–L-BH, 2013 WL 5314354, at *9 (N.D. Tex. Sep. 23, 2013) (citing *SEC v. Spence & Green Chem. Co.*, 612 F.2d 896, 903 (5th Cir. 1980)("[T]he proscriptions of section 17(a) are substantially the same as those of section 10(b) and rule 10b–5."). Like Section 10(b) and Rule 10b-5, Section 17(a)(1) violations must be supported by allegations of *scienter* or intent to defraud, while Sections 17(a)(2) and 17(a)(3) only require negligence. *SEC v. Gilman*, No. 3:18-CV-1421-L, 2019 WL 4743431, at *9 (N.D. Tex. Sep. 26, 2019) (citing *Aaron v. SEC*, 446 U.S. 680, 696-97 (5th Cir. 1980)); *see also Sethi*, 910 F.3d at 206 (same).  To show *scienter*, "both intent and severe recklessness are sufficient" to satisfy the *scienter* requirement for a security frauds claim. *Gilman*, 2014 WL 4652121, at *7 (quoting *Mun. Employees' Ret. Sys. Of Mich. v. Pier 1 Imports, Inc.*, 935 F.3d 424, 430 (5th Cir. 2019) (internal quotation omitted).

Here, the complaint alleges that Defendant violated the Securities Act and the Exchange Act. (doc. 1 at 16-17.)  As discussed, it alleges that Defendant misrepresented his background to

---

[5]  Section 17(a) of the Securities Act states in relevant part:

It shall be unlawful for any person in the offer or sale of any securities ... by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

clients, misrepresented facts about TTG, omitted his past conduct from disclosure, and actively concealed it by shielding his identity from the public. (doc. 1 at 10-13.) It also alleges that he represented to his current and prospective clients that the DAMPs would pay outsized returns, that the returns were guaranteed and insured, and that both DAMPs were exclusive investments for TTG members. (*Id.* at 12, 14.) The complaint alleges that Defendant did not conduct any meaningful due diligence on the DAMPs, did not verify the accuracy of his representations, had no reasonable basis for making them, and that the clients reasonable believed that Defendant thoroughly vetted his representations. (*Id.* at 12-13.) It also alleged that Defendant omitted material facts regarding his commission arrangements for the investments and his private concerns that the DAMPs were fraudulent. (*See id.* at 13-15.)

The SEC's allegations establishes that Defendant used fraudulent devices, made material misrepresentations and omissions, and committed fraudulent or deceitful acts in connection with the offer, purchase, or sale of securities. They also establish that Defendant acted with a high degree of *scienter. See Sethi*, 910 F.3d at 206; *Gann,* 565 F.3d at 936; *see also Gilman,* 2019 WL 4743431, at *9 (noting that a showing of *scienter* also meets the lesser burden of negligence for Sections 17(a)(2) and (a)(3)). Therefore, the SEC is entitled to default judgment on its claims under the Securities Act and the Exchange Act.

**C. <u>Appropriateness of Relief</u>**

The SEC seeks injunctive relief and to recover a total aggregate amount of $710,204.70, which includes a disgorgement of $429,072.07 of the net profits gained by Defendant, pre-judgment interest in the amount of $21,132.63, and a civil penalty of $260,000 for violations of the Advisers Act, the Securities Act, and the Exchange Act. (doc. 10 at 7.)

In awarding relief, "[a] default judgment must not differ in kind from, or exceed in amount,

what is demanded in the pleadings." Fed. R. Civ. P. 54(c). The relief requested in a plaintiff's complaint limits the relief available in a default judgment. *See Sapp v. Renfroe*, 511 F.2d 172, 176 n. 3 (5th Cir. 1975). Damages on a default judgment are normally not awarded without a hearing or a demonstration by detailed affidavits; however, a hearing is unnecessary if the amount of damages can be determined with a mathematical calculation by reference to the pleadings and supporting documents. *See James v. Frame*, 6 F.3d 307, 310 (5th Cir. 1993). The burden is on the plaintiff to provide an evidentiary basis for the damages it seeks. *Broadcast Music, Inc. v. Bostock Billiards & Bar Assoc.*, No. 3:12-CV-413-B, 2013 WL 12126268, at *3 (N.D. Tex. Jan. 18, 2013). Because the requested relief does not differ in kind from, or exceed in amount, what is demanded in the pleadings, the only remaining issue is whether the relief requested is appropriate based on the governing law. *Chevron Intellectual Property, LLC v. Allen*, No. 7:08-CV-98-O, 2009 WL 2596610, at *3 (N.D. Tex. Aug. 24, 2009).

### 1. Permanent Injunction

The SEC seeks a permanent injunction enjoining Defendant from future violations of Sections 206(1) and 206(2) of the Advisers Act, Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b–5. (doc. 10 at 7.)[6] It also requests a specific permanent injunction to enjoin Defendant from "participating in the issuance, purchase, offer, or sale of any securities." (*Id.* at 7.)

Section 209(d) of the Advisers Act, 15 U.S.C. § 80b-9(d), Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d),

---

[6] On January 1, 2021, Congress amended Section 21(d) of the Securities Act and extended the statute-of-limitations period for the SEC to bring equitable relief claims such as an injunction or a bar, suspension, or a cease-and-desist order, to ten years from the latest date of the violation. *See* National Defense Authorization Act for Fiscal Year 2021 (NDAA), Pub. L. No. 116-283, § 6501(a)(3), 134 Stat. 3388, 4625-26 (Jan. 1, 2021) (codified as 15 U.S.C. § 78u(d)(8)(B)). The SEC's claim for an injunction against Defendant did not accrue more than ten years before it brought this action.

authorize the SEC to seek injunctive relief upon a "proper showing" that the defendant "is engaged or is about to engage" in violations of the securities laws. *SEC v. Thomas*, No. 3:13–CV–739–L, 2014 WL 840030, at \*2 (N.D. Tex. Mar. 4, 2014) (citing *SEC v. Zale Corp.,* 650 F.2d 718, 720 (5th Cir.1981)). "A permanent injunction is appropriate only if a defendant's past conduct gives rise to an inference that, in light of present circumstances, there is a reasonable likelihood of future transgressions." *SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 784 (5th Cir. 2017) (quotation omitted). In determining whether a defendant should be permanently enjoined, the court must consider: (1) the egregiousness of the defendant's conduct; (2) the isolated or recurrent nature of the violation; (3) the degree of *scienter,* (4) the sincerity of the defendant's recognition of his transgression; and (5) the likelihood of the defendant's job providing opportunities for future violations. *Gann*, 565 F.3d at 940 (citing *SEC v. Blatt,* 583 F.2d 1325, 1334 n. 29 (5th Cir. 1978)).

Here, the SEC has alleged that Defendant's conduct was egregious as he made deceptive misrepresentations, omitted material information, and was paid commissions for referral arrangements. (*See* doc. 1 at 10-15.) It has demonstrated that Defendant acted with a high degree of *scienter*.  His conduct has been recurrent since November 2014 and has occurred in several states, and the TTG clients lost approximately $1.1 million from it, while he received a net profit of $429,072.07 in advisory fees, investment funds from clients, and commission payments. (docs. 1 at 2-15; 11-1 at 8.) The violations are not isolated, as Defendant's past conduct contains a criminal conviction, multiple state cease-and-desist orders, and a permanent injunction and industry bar obtained by the SEC. (doc. 1 at 3-5.) Given his past conduct, if a permanent injunction is not imposed, he could engage in similar transgressions as an investment adviser in the future. (*See* docs. 1; 10.) Accordingly, the Defendant should be permanently enjoined from future violations of Sections 206(1) and 206(2) of the Advisers Act, Section 17(a) of the Securities

Act, Section 10(b) of the Exchange Act, and Rule 10b–5. *See Life Partners Holdings, Inc.*, 854

F.3d at 784 (finding permanent injunctive relief is appropriate against the defendant-appellant for

violating the reporting requirements of Section 13(a) under the Exchange Act). Additionally,

Defendant should also be permanently enjoined from issuing, purchasing, offering, or selling any

securities.[7] *See SEC v. AmeraTex Energy, Inc.*, No. 4:18-CV-00129, 2021 WL 1061395, at *5

(E.D. Tex. Mar 18, 2021) (applying the permanent injunction factors towards a specific injunctive

relief to enjoin the defendant "from the issuance, offer, or sale of any security") (citations omitted).

### 2. Disgorgement and Pre-Judgment Interest

The SEC seeks disgorgement of all of Defendant's "ill-gotten gains" plus pre-judgment

interest. (docs. 1 at 18; 10 at 22-23.)

Disgorgement "is an equitable remedy meant to prevent the wrongdoer from enriching

himself by his wrongs." *Allstate Ins. Co. v. Receivable Fin. Co.*, 501 F.3d 398, 413 (5th Cir. 2007)

(internal citation and quotation marks omitted); *see Liu v. SEC*, —U.S.—, 140 S. Ct. 1936, 1950

(2020)) (holding that a disgorgement award that does not exceed a wrongdoer's net profits and is

awarded for victims is equitable relief permissible under 15 U.S.C. § 78u(d)(5)). A district court

retains "broad discretion in fashioning the equitable remedy of a disgorgement order." *SEC v.

Huffman*, 996 F.2d 800, 803 (5th Cir. 1993). Because disgorgement is remedial rather than punitive

in nature, it should be limited to property "causally related" to the violative conduct. *Allstate Ins.

Co.*, 501 F.3d at 413. "Accordingly, the party seeking disgorgement must distinguish between that

which has been legally and illegally obtained." *Id.* However, "[i]n actions brought by the SEC

involving a securities violation, 'disgorgement need only be a reasonable approximation of profits

---

[7]The requested injunction does not prevent Defendant from purchasing or selling securities for his own personal benefits.

causally connected to the violation.'" *Id.* (quoting *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C.Cir. 1989)). Once the SEC makes that showing, the burden shifts to the defendant to establish that the disgorgement figure was not a reasonable approximation. *First City Fin. Corp.*, 890 F.2d at 1232.

"Courts have recognized that an assessment of prejudgment interest, like the disgorgement remedy, is intended to deprive wrongdoers of profits they illegally obtained by violating the securities law." *SEC v. Sargent*, 329 F.3d 34, 40 (1st Cir. 2003) (internal quotations and citations omitted). Prejudgment interest is ordinarily calculated according to the Internal Revenue Service's (IRS) underpayment rate. *See S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996) (approving application of IRS underpayment rate for calculating prejudgment interest on amounts disgorged due to securities violations).

The SEC's motion seeks disgorgement in the amount of $429,072.07 from Defendant, and to return the funds to TTG clients who lost significant sums of money. (doc. 10 at 7, 24-25.)[8] The SEC's supporting declaration states that according to its analysis, Defendant's net profits from his wrongful conduct are $429,072.07. (docs. 11-1 at 8-9.) It also provides a table of the pre-judgment interest calculation from October 28, 2019, the last date client funds were deposited in the Defendant's bank accounts, to January 31, 2021. (docs 11-1 at 9; 11-2.) The calculations are supported by the IRS's underpayment tax rate to calculate pre-judgment interest on disgorgement amounts in quarterly periods. (docs. 11-1 at 8-9; 11-2.) The evidence the SEC has presented

---

[8] The NDAA also extended the statute-of-limitations period to ten years from the latest date of the violation for the SEC to bring a disgorgement action under Section 21(d) of the Exchange Act. *See* 15 U.S.C. § 78u(d)(8)(A)(ii). The statute provides that the SEC may bring a claim for disgorgement within ten years for violations under Section 10(b) of the Exchange Act, Section 17(a)(1) of the Securities Act, Section 206(1) of the Advisers Act, and "any other provisions of the securities laws for which *scienter* must be established." *Id.* at 4626. The SEC's claim for engorgement against Defendant has not accrued more than ten years before it was brought.

supports the relief requested.

Because Defendant's funds and transactions are categorized and the amount is capable of mathematical calculation, the amount of judgment can be reliably computed without a hearing. *See* Fed. R. Civ. P.55(b)(2) ("*If*, in order to enable the court to enter judgment . . . it is necessary to take an account or to determine the amount of damages . . . the court *may* conduct such hearings or order such references as it deems necessary and proper . . .") (emphasis added); *see also James*, 6 F.3d at 310 (stating that the court relied on affidavits, documentary evidence, and the judge's personal knowledge of the record). Based on the record, the SEC has shown that an award of disgorgement of $429,072.07, plus interest accrued quarterly between October 28, 2019 and January 31, 2021 of $21,132.63, is permitted. Accordingly, its request for disgorgement and pre-judgment interest should be granted, and Defendant should be ordered to disgorge $427,072.07, plus pre-judgment interest accrued in the amount of $21,132.63, for his victims under *Liu v. SEC*, —U.S.—, 140 S. Ct. 1936, 1950 (2020)) (holding that a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under 15 U.S.C. § 78u(d)(5)).

### *3. Civil Penalty*

Finally, the SEC seeks an award of a civil penalty in the amount of $260,000 against Defendant. (doc. 10 at 7, 26.)

Section 209(e) of the Advisers Act, Section 20(d) of the Securities Act, and Section 21(d)(3) of the Exchange Act authorize the SEC to assess civil penalties against an individual for committing any violations under the provisions, and establish a three-tier penalty structure for securities laws violations depending on the egregiousness of the conduct. 15 U.S.C. §§ 80b–9(e), 77t(d), 78u(d)(3); *see also Thomas*, 2014 WL 840030, at *4. A first-tier penalty can be imposed

based on a showing of a violation of the securities provisions. *SEC v. Sample*, No. 3:14-CV-1218-B, 2017 WL 5569873, at *3 (N.D. Tex. Nov. 20, 2017); *see also* §§ 80b–9(e), 77t(d), 78u(d)(3). A second-tier violation is imposed if the violation involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." §§ 80b–9(e), 77t(d), 78u(d)(3). A third-tier violation is imposed if the violation "(1) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement, and (2) such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Id.* For individuals, the maximum penalty under Section 209(e), Section 20(d), and Section 21(d)(3) is $195,047 per third-tier penalty for each violation, or the gross amount of pecuniary gain, whichever is greater. *See id;* 17 C.F.R. § 201.1002 (increasing statutory penalty amounts to account for inflation).[9] To determine whether to impose a civil penalty, courts look at the following factors:

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's *scienter*; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

*Sample*, 2017 WL 5569873, at *3 (citing *SEC v. Reynolds*, No. 3:08-CV-0438-B, 2013 WL 3479825, at *5 (N.D. Tex. July 11, 2013).

Here, in support of its request for a third-tier civil penalty, the SEC provides a declaration stating that Defendant received approximately $260,000, which represents the gross pecuniary gain he received during the five-year period preceding the filing of the complaint. (docs. 10 at 27;

---

[9]  For violations after November 2, 2015, the maximum amount of all civil penalties that the SEC can impose under the Securities Act, Exchange Act, and Advisers Act is adjusted annually for inflation. 17 C.F.R. § 201.1002(b). The complaint and motion provide that Defendant's violations occurred after November 3, 2015, and that the inflation amount has been adjusted to all penalties imposed after January 15, 2021, for violations that occurred after November 2, 2015. *See* SEC, *Inflation Adjustments to the Civil Monetary Penalties Administered by the Securities and Exchange Commission (as of January 15, 2021)* (2021).

11-1 at 8.) As discussed, it has shown that Defendant's conduct was egregious, he acted with a high degree of *scienter*, and his conduct resulted in substantial losses to his clients of approximately $1.1. million. This conduct was not isolated, as it persisted for five years while operating TTG, and he had previously been repeatedly charged, convicted and/or disciplined for violating securities laws in several states. Defendant has not admitted any wrongdoing, and he has not demonstrated his inability to pay or that a reduction in the maximum amount is warranted in this case. Because Defendant's violations of the Advisers Act, Securities Act, and Exchange Act involved fraud, deceit, and deliberate or reckless disregard of a regulatory requirement, and such violations directly or indirectly resulted in substantial losses to the investors, a third-tier penalty should be imposed against him. §§ 80b–9(e), 77t(d), 78u(d)(3); *see also Thomas*, 2014 WL 840030, at *4.

Accordingly, Defendant should be ordered to pay a maximum civil penalty of $260,000 for his gross pecuniary gains.

## III.  RECOMMENDATION

The SEC's motion for default judgment motion should be **GRANTED**, and the Court should order that:

1. Defendant be permanently restrained and enjoined from violating, directly or indirectly, Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 (the "Advisers Act") [15 U.S.C. §§ 80b-6(1) & 80b-6(2)], by using the mails or any means or instrumentality of interstate commerce:

(a) to employ any device, scheme, or artifice to defraud any client or prospective client; or

(b) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon any client or prospective client.

2. Defendant be permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

(a) to employ any device, scheme, or artifice to defraud;

(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

3. Defendant be permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

(a) to employ any device, scheme, or artifice to defraud;

(b) to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

4. Defendant be permanently restrained and enjoined from directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance,

purchase, offer, or sale of any securities; provided however that such injunction shall not prevent him from purchasing or selling securities for his own personal account, as authorized under Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

5. The permanent injunction against Defendant, as provided in Federal Rule of Civil Procedure 65(d)(2), will also bind the following who receive actual notice of this Final Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

6. Defendant is liable for disgorgement of $429,072.07, representing net profits gained as a result of the conduct alleged in the Complaint, together with prejudgment interest thereon in the amount of $21,132.63, and a civil penalty in the amount of $260,000 pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)], Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d)(3) of the Exchange Act of 1934 [15 U.S.C. § 78u(d)(3)]. Defendant is required to satisfy this obligation by paying $710,204.70 to the Commission within 30 days after entry of this Final Judgment. Defendant may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Defendant may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and

28

name of this Court; the Defendant's name as a defendant in this action; and specifying that payment is made pursuant to this Final Judgment. Defendant shall simultaneously transmit photocopies of evidence of payment and case identifying information to the Commission's counsel in this action. By making this payment, Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to Defendant.

The Commission may enforce the Court's judgment for disgorgement and prejudgment interest by using all collection procedures authorized by law, including, but not limited to, moving for civil contempt at any time after 30 days following entry of this Final Judgment. The Commission may enforce the Court's judgment for penalties by the use of all collection procedures authorized by law, including the Federal Debt Collection Procedures Act, 28 U.S.C. § 3001 *et seq.*, and moving for civil contempt for the violation of any Court orders issued in this action. Defendants shall pay post judgment interest on any amounts due after 30 days of the entry of this Final Judgment pursuant to 28 U.S.C. § 1961. The Commission shall hold the funds, together with any interest and income earned thereon (collectively, the "Fund"), pending further order of the Court. The Commission may propose a plan to distribute the Fund subject to the Court's approval. Such a plan may provide that the Fund shall be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002. The Court shall retain jurisdiction over the administration of any distribution of the Fund and the Fund may only be disbursed pursuant to an Order of the Court.

Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil penalties pursuant to this Final Judgment shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Defendant shall not, after offset or reduction of any award of compensatory damages in

29

any Related Investor Action based on the Defendant's payment of disgorgement in this action, argue that the Defendant is entitled to, nor shall the Defendant further benefit by, offset or reduction of such compensatory damages award by the amount of any part of the Defendant's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Defendant shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this Final Judgment. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Defendant by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action.

7. Solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. § 523, the allegations in the Complaint are true and admitted by Defendant, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Defendant under this Final Judgment or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Defendant of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. § 523(a)(19).

8. The Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

**SO RECOMMENDED** on this 10th day of September, 2021.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

### INSTRUCTIONS FOR SERVICE AND
### NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

31